**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

**HERMAN LEE COOK,**

      **Plaintiff,**

**v.**                                                          **Case No.: 2:13-cv-20573**

**CAROLYN W. COLVIN,
Acting Commissioner of the
Social Security Administration,**

      **Defendant.**

<u>**PROPOSED FINDINGS AND RECOMMENDATIONS**</u>

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Claimant's application for supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. This case is assigned to the Honorable Thomas E. Johnston, United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' motions for judgment on the pleadings as articulated in their briefs. (ECF Nos. 10, 11).

Having fully considered the record and the arguments of the parties, the undersigned United States Magistrate Judge respectfully **RECOMMENDS** that the presiding District Judge **GRANT** Plaintiff's motion for a remand, (ECF No. 10); **DENY** Defendant's request to affirm the decision of the Commissioner, (ECF No. 11);

1

**REVERSE** the final decision of the Commissioner; **REMAND** this matter pursuant to sentence four of 42 U.S.C. § 405(g); and **DISMISS** this action from the docket of the Court.

## I. <u>Procedural History</u>

Herman Lee Cook ("Claimant") filed an application for SSI on July 18, 2008, alleging a disability onset date of June 19, 2007, (Tr. at 222), due to "spinal disease and deterioration of hips." (Tr. at 239). The Social Security Administration ("SSA") denied Claimant's application initially and upon reconsideration. (Tr. at 10). Consequently, Claimant filed a request for an administrative hearing, which was held on November 16, 2009 before the Honorable Andrew J. Chwalibog, Administrative Law Judge ("ALJ"). (Tr. at 29-50). By written decision dated January 19, 2010, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 79-87). Claimant filed a request for review with the Appeals Council, and on October 18, 2010, the Appeals Council granted the request, vacated the hearing decision, and remanded the case to the ALJ for resolution of specific issues based upon the new and material evidence provision of the social security regulations. (Tr. at 92-94). In particular, the Appeals Council instructed the ALJ, *inter alia*, to obtain and evaluate additional evidence concerning Claimant's intellectual functioning, to give further consideration to Claimant's residual functional capacity, as warranted, and to obtain additional evidence from a vocational expert, if necessary. (*Id.*).

After gathering supplemental information and arranging for consultative assessments, the ALJ conducted a second administrative hearing on November 10, 2011. (Tr. at 51-73). By written decision dated February 14, 2012, the ALJ again concluded that Claimant was not disabled as defined in the Social Security Act. (Tr. at

10-22). The ALJ's decision became the final decision of the Commissioner on May 13, 2013 when the Appeals Council denied Claimant's request for review. (Tr. at 1-3).

Claimant timely filed the present civil action seeking judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner filed an Answer and a Transcript of the Administrative Proceedings. (ECF Nos. 8, 9). Plaintiff filed a Brief in Support of the Pleadings, and Defendant filed a Brief in Support of Defendant's Decision. (ECF Nos. 10, 11). Therefore, the matter is fully briefed and ready for resolution.

## II.   **Claimant's Background**

Claimant was 43 years old at the time of his initial application and 47 years old at the time of the ALJ's decision. (Tr. at 20). He spent ten years in school, most of those in special education classes, and dropped out at age sixteen.  (Tr. at 33, 573, 581). Claimant communicates in English, but is not able to read or write well, and cannot perform basic mathematic calculations. (Tr. at 33-34) Claimant's past relevant work includes employment as a well tender for an oil and gas company. (Tr. at 20).

## III.   **Summary of ALJ's Decision**

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five step sequential evaluation process for the adjudication of disability claims. If an individual is found "not

disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. § 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 416.920(b). If the claimant is not engaged in substantial gainful employment, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 416.920(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, under the fourth step the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 416.920(e). After making this determination, the ALJ must ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, as the fifth and final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. § 416.920(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that

4

this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger,* 538 F.2d. 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. § 416.920a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* § 416.920a(b). If an impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in the regulations. *Id.* § 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* § 416.920a(d). A rating of "none" or "mild" in the first three functional areas (limitations on activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation of extended duration) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* § 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating of the degree of functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* § 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental function. 20 C.F.R. § 416.920a(d)(3). The

Regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

*Id.* § 416.920a(e)(4).

In this case, the ALJ confirmed at the first step of the sequential evaluation that Claimant had not engaged in substantial gainful activity since July 17, 2008, the amended application date. (Tr. 13, Finding No. 1). At the second step of the evaluation, the ALJ determined that Claimant had the following severe impairments: "degenerative disc disease of the cervical and lumbar spines, borderline intellectual functioning, and depression." (Tr. at 13-14, Finding No. 2). The ALJ considered Claimant's additional alleged impairments of chronic obstructive pulmonary disease, diabetes mellitus, Type II, and arthritis of the knee, but found these to be non-severe. (*Id.*). Under the third inquiry, the ALJ concluded that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 14-15, Finding No. 3). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except can occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; must avoid concentrated exposure to extreme temperatures, humidity, vibration, hazards, smoke, fumes, odors pollutants, and pulmonary irritants; has a moderate limitation (defined as more than a slight limitation, but able to function satisfactorily) to understand, remember, and carry out complex job instructions; make judgments on complex work-related decisions; a mild limitation (defined as a slight limitation, but can generally function well) to interact appropriately with the public;

6

interact appropriately with supervisors and co-workers; and respond appropriately to usual work situations and to changes in a routine work setting; and limited to simple tasks.

(Tr. at 15-20, Finding No. 4). At the fourth step, the ALJ determined that Claimant was unable to perform his past relevant work as a well tender. (Tr. 20, Finding, No. 5).  Under the fifth and final inquiry, the ALJ reviewed Claimant's past work-related experience, age, and education in combination with his RFC to determine his ability to engage in substantial gainful activity. (Tr. at 20-21, Finding Nos. 5-9). The ALJ considered that (1) Claimant was born in 1964, and was defined as a younger individual; (2) he had a limited education and could communicate in English; and (3) transferability of job skills was not material to the determination because the Medical-Vocational Rules supported a finding of "not disabled" regardless of the transferability of skills. (Tr. at 20, Finding Nos. 6-8). Taking into account these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ determined that Claimant could perform jobs that exist in significant numbers in the national economy, including work as a price marker, small products assembler, house sitter, surveillance system monitor, bench worker, and final assembler. (Tr. at 20-21, Finding No. 9). Therefore, the ALJ concluded that Claimant had not been under a disability, as defined in the Social Security Act, since July 17, 2008. (Tr. at 21, Finding No. 10).

## IV.   <u>Claimant's Challenges</u>

Claimant argues that the Commissioner's decision is not supported by substantial evidence because the ALJ erred when he found that Claimant did not meet Listing 12.05C. (ECF No. 10 at 5-9). According to Claimant, he presented evidence to meet all three prongs of the listing, including valid IQ scores within the

range of 60-70, which the ALJ improperly rejected.

In response, the Commissioner contends that the ALJ correctly relied upon the findings and conclusions of consultative expert, Lisa Tate, M.A., who opined that Claimant's intellectual functioning fell within the borderline range, rather than in the range of mental retardation required to meet listing 12.05C. The Commissioner points out that IQ scores must be considered in conjunction with the accompanying narrative report, and in this case, Ms. Tate believed the scores underrepresented Claimant's intellectual capacity as evidenced by his adaptive functioning. (ECF No. 11 at 6-11).

## V.   **Relevant Medical History**

The undersigned has reviewed the transcript of proceedings in its entirety including the medical records in evidence. The following is a summary of Claimant's medical information.

### A.  Treatment Records

#### *1.  Michael W. Gibbs, M.D.*

Dr. Gibbs was Claimant's family physician and produced office records detailing visits with Claimant beginning on January 8, 2007 through August 13, 2008. On January 8, 2007, Dr. Gibbs noted that Claimant had been unemployed for some time, although he occasionally tended wells as he had done in the past. (Tr. at 405). He had several chronic medical issues, including untreated Type 2 diabetes mellitus ("DM"), chronic obstructive pulmonary disease ("COPD"), back pain, and tobacco abuse. Dr. Gibbs felt that Clamant needed to be seen more frequently for closer management. (Tr. at 406). Thus, Claimant returned in April and May for that purpose. (Tr. at 402-404).

On June 19, 2007, Claimant was involved in a motor vehicle accident that caused him to be taken by ambulance to the Emergency Department at Charleston Area Medical Center. (Tr. at 328). Claimant was a passenger in a pick-up truck that broad-sided another vehicle. He was examined and x-rayed, and ultimately was diagnosed with a cervical and lumbar strain. Claimant was given prescriptions for Motrin, Lortab, and Flexeril and instructed to follow-up with Dr. Gibbs. (Tr. at 329). Claimant presented to Dr. Gibbs's office on June 26, 2007 where he reported that he continued to have neck, back, and hip pain from the accident, as well as blurred vision. (Tr. at 400). Claimant explained that the truck in which he was traveling hit a Chevy Blazer. He was in the front passenger seat at the time of the collision and braced himself with one hand against the dashboard and the other hand behind the seat. He recalled being banged around, although he did not strike his head or lose consciousness. The truck was crushed back to the window, forcing the rescue crew to use a crowbar to open his door. (*Id.*). After examining Claimant, Dr. Gibbs diagnosed cervical whiplash and musculoskeletal myalgias. He told Claimant to return in ten days, and he would release Claimant to work if he was doing well. (*Id.*). For the time being, Dr. Gibbs wrote Claimant a work excuse that was valid through July 10, 2007. (Tr. at 536). Dr. Gibbs extended the excuse through July 25, 2007 when Claimant continued to have neck problems at his follow-up visit on July 10, 2007. (Tr. at 529, 536).

On July 16, 2007, Dr. Gibbs received a letter from Greg Bowling, a physical therapist at Barboursville Physical Therapy, thanking Dr. Gibbs for referring Claimant for physical therapy and reporting on the initial visit. (Tr. at 520). Mr. Bowling wrote that Claimant reported being injured while traveling with his boss. He

9

complained of constant pain in the cervical and mid-scapular regions, which he described as being 7 out of 10 on a ten-point severity scale. Claimant was treated with electrical stimulation and ice, and Mr. Bowling planned to progress with a range of motion and strengthening program as tolerated. (*Id.*).

Claimant returned to Dr. Gibbs's office on July 24, 2007. (Tr. at 526). Despite having several physical therapy sessions, he still complained of widespread tenderness. Therefore, Dr. Gibbs decided to arrange an MRI. He gave Claimant a work excuse through August 24, 2007. (Tr. at 558).

On August 14, 2007, Mr. Bowling wrote Dr. Gibbs regarding Claimant's progress with physical therapy. (Tr. at 557). Mr. Bowling reported that Claimant had been treated for ten sessions; however, on his eleventh visit he stated that he had tried to mow the grass over the weekend and experienced significant numbness in his right upper extremity. In addition, Claimant indicated that he had neck pain and headaches. Mr. Bowling noted that despite all efforts, Claimant had gained only minimal relief from physical therapy. In view of Claimant's lack of improvement, Mr. Bowling notified Dr. Gibbs that he was discontinuing Claimant's physical therapy. (*Id.*).

Dr. Gibbs saw Claimant again on August 27, 2007. (Tr. at 525). Dr. Gibbs documented that Medicaid denied authorization for the MRI even though Claimant continued to complain of cervical and scapular pain with radicular symptoms. Dr. Gibbs considered other avenues to obtain payment for the MRI. In the meantime, he extended Claimant's work excuse another month. (*Id.*). The MRI was finally completed on September 7, 2007 and showed some small disc protrusions at C2-3 and T3-4, without significant spinal stenosis. (Tr. at 506-07). Based on this report,

Dr. Gibbs referred Claimant for pain management and wrote him a work excuse through October 31, 2007. (Tr. at 553).

On November 28, 2007, Claimant presented to Dr. Gibbs's office complaining of continued pain that was not controlled with medication. (Tr. at 549). He reported having used all of his Lortab prescription. Dr. Gibbs observed that pain was Claimant's entire focus, and he questioned whether Claimant was malingering. (*Id.*). He diagnosed Claimant with depression and chronic pain and prescribed Cymbalta, Neurontin, and Percocet. (*Id.*). Six weeks later, Dr. Gibbs noted that Claimant was still focused on his pain and the accident, and was lways complaining of pain. (Tr. at 544). He wrote Claimant another work excuse through the end of January 2008. (*Id.*).

The remaining office visits documented by Dr. Gibbs during 2008 reflect his concern over the lack of improvement in Claimant's chronic pain condition. (Tr. at 542, 426, 539, 425, 424). An April 2008 MRI showed a small central disc protrusion at the T3-4 level and mild multilevel degenerative disc disease. (Tr. at 541). Dr. Gibbs again questioned whether Claimant was malingering, (Tr. at 542), although on one visit, he observed that Claimant looked "strung out." (Tr. at 425). He described Claimant as distressed and unkempt, complaining of pain. Claimant was not taking medications because he had lost his medical card. (*Id.*). Dr. Gibbs wrote Claimant an excuse from work that extended through the end of June 2008. (Tr. at 539).

The final notation from Dr. Gibbs is an excuse from petit jury duty dated November 15, 2010. (Tr. at 598). According to the note, Claimant was medically unable to perform as a juror due to severe cervical and lumbar spinal stenosis that made it difficult for him to sit for periods greater than ten to fifteen minutes at a time.

(Tr. at 598).

### 2. David Caraway, M.D.—St. Mary's Pain Management

Dr. Caraway performed an initial evaluation of Claimant on February 19, 2008 for complaints of chronic, unbearable pain in the neck radiating down the right arm into the fingers. (Tr. at 490). Claimant also reported right hip pain, and right arm and shoulder pain. He described his pain as burning, stabbing, throbbing, tingling, and aching. (Tr. at 494). After taking a history and examining Claimant, Dr. Caraway diagnosed cervical degenerative disc disease and radiculopathy. (Tr. at 491). He indicated that Claimant refused pain injections; therefore, he planned to treat Claimant with medications including Lyrica and Zanaflex. (*Id.*).

When Claimant returned on July 8, 2008, he advised Dr. Caraway that he wanted to see a neurosurgeon to determine if there was a surgical fix for his debilitating neck pain. (Tr. at 476-77). Dr. Caraway indicated that the MRI showed only small disc protrusions; he doubted that there was anything that could be done surgically. However, if Dr. Gibbs felt a neurosurgery evaluation was appropriate, he could make a referral. Dr. Caraway also observed that Claimant guarded his right arm, until he lost focus. Then, he was able to move his arm without a problem. (*Id.*). Dr. Caraway had Claimant sign a narcotics contract and prescribed Lortab twice per day.

Claimant had a follow-up visit with Dr. Caraway on September 19, 2008 at which they decided to schedule him for three cervical epidural steroid injections. (Tr. at 459-60). Two injections were administered; one on January 2, 2009, and one on February 13, 2009. On April 23, 2009, Dr. Caraway examined Claimant and found tenderness across his occipital ridge without frank spasm. He had good range of

motion of the upper extremities, normal grip strength, and was neurologically intact, but he continued to complain of chronic pain. (Tr. at 444). Claimant reported that the cervical epidural injections provided some relief, but only for a few days. Dr. Caraway diagnosed Claimant with chronic neck and bilateral shoulder pain. He opined that there was little else that could be done for Claimant from an interventional standpoint and suggested trying a TENS unit and intermittent opioid analgesics. (Tr. at 445).

### B. Evaluations and Opinions

#### 1. *Physical Impairments*

On December 21, 2007, Porfirio Pascasio, M.D., an agency consultant, completed s Physical Residual Functional Capacity Assessment Form at the request of the SSA. (Tr. at 409-416). After completing a records review, Dr. Pascasio concluded that there was insufficient evidence in the file to assess Claimant's RFC; particularly, as Claimant had failed to appear at an agency scheduled physical examination and assessment. (Tr. at 416).

A disability examination of Claimant was subsequently performed by Stephen Nutter, M.D. on September 2, 2008. (Tr. at 369-74). Claimant reported having back pain for a period of ten years and neck pain for one year. The back pain had no known cause, while the neck pain was caused by a motor vehicle accident. He complained that the pain radiated down his left arm and leg, and was constant. In addition, Claimant had joint pain in his shoulder and hips. Movement aggravated his pain, and physical therapy did not help relieve it. (Tr. at 369). Dr. Nutter performed a physical examination, including thorough range of motion testing. (Tr. at 370-73). Ultimately, he diagnosed Claimant with chronic cervical and lumbar strain and degenerative disc

disease without radiculopathy, chest pain, COPD, and degenerative arthritis. (Tr. at 373).

Based in part on Dr. Nutter's examination, and in part on a records review, a non-physician RFC assessment form was completed on September 16, 2008 by Stephanie Eddy of West Virginia Disability Determination Services. (Tr. at 378-385). Ms. Eddy found that Claimant could lift and carry twenty pounds occasionally and ten pounds frequently. He could sit, stand, and walk six hours each in an eight-hour work day with normal breaks, and could push and pull without limitation. Other than some climbing restrictions and some environmental restrictions related to concentrated exposures to extreme temperatures, humidity, fumes, odors, gases, dusts, and hazards, Ms. Eddy found no other functional limitations. (*Id.*). An agency consultant, Dr. Caroline Williams, affirmed this RFC assessment on November 13, 2008, indicating that there had been no changes in Claimant's condition in the interim. (Tr. at 389).

On November 11, 2009, Mike Kennedy, P.T., of Barboursville Physical Therapy, performed a functional capacity evaluation at the request of Claimant's treating physician, Dr. Gibbs. (Tr. at 561-572). Dr. Gibbs asked that three specific questions be answered, including whether Mr. Cook gave full physical effort during testing; whether his subjective reports were reliable; and the level of his physical work tolerances. (Tr. at 561). Answering the first question, Mr. Kennedy stated that Claimant's effort varied during the testing. At times, Claimant did not put forth maximum effort. As far as the reliability of Claimant's subjective reports, Mr. Kennedy indicated that there were some minor inconsistencies between Claimant's statements and the testing; however, for the most part, the subjective reports

14

generally matched clinical observations. Finally, Mr. Kennedy opined that Claimant could do sedentary to just below light level work. He mentioned that Claimant had a very strong subjective component to his clinical presentation with widespread pain on nearly every physical activity. (Tr. at 561-61).

On June 10, 2010, an evaluation was completed by Dr. Greg Chaney for the West Virginia Department of Health and Human Resources Medical Review Team. (Tr. at 595-97). Much of the evaluation is illegible; however, Dr. Chaney opined that Claimant could not work full-time because he was unable to stand for more than ten minutes at a time, and he could not sit for more than thirty minutes at a time. (Tr. at 596). He recommended that Claimant avoid any work situation that was more physically demanding than sedentary or that was stressful. Dr. Chaney concluded that Claimant "has multiple musculoskeletal physical problems as well as psychological problems that would substantially limit employability." (Tr. at 597).

### 2. *Mental Impairments*

In September 1978, when Claimant was one month shy of his fourteenth birthday, the Lincoln County school system completed an evaluation of Claimant in order to prepare for him an Individual Education Program ("IEP"). (Tr. at 318-22). A variety of tests were performed, including a Wechsler Intelligence Scale for Children, although the results of the tests are not included in the school records. Nonetheless, based upon the testing, the placement recommendation was "educable mental retardation full time with supportive services." (Tr. at 318). Claimant was placed in educable mental retardation classes twenty seven and one half hours per week with two and one half hours of regular physical education. Claimant received average grades until he reached the ninth grade in 1979. (Tr. at 319). In his first semester,

15

Claimant received a failing grade in English and American Studies, a D in Math, and a D minus in custodial services. (*Id.*). By the second semester, he apparently was no longer attending school. He did not pass the ninth grade and was given an incomplete in custodial services. (*Id.*).

On July 29, 1993, Claimant was examined by Lawrence Barker, Ed.D., at the request of the SSA. (Tr. at 573-578). At the time, Claimant was 28 years old and married. He reported having a tenth grade education, although beginning in the third grade, his classroom time was spent in special education courses. He also stated that he received carpentry training in school. Dr. Barker described Claimant as a "poor informant," but indicated that Claimant reported working in construction for eight to ten years putting roofs on homes in Chicago, near "Lake Erie." (Tr. at 573). He then returned to Lincoln County, where he met and married his wife. He now was complaining of chronic back pain and depression that caused him to stay home doing little else other than watching television. (Tr. at 574).

Dr. Barker conducted a mental status examination, observing Claimant to be "lively and dramatic." He indicated that Claimant was adamant that he could not work due to his pain, although he seemed to have little difficulty in ambulating and sitting. (Tr. at 575). Dr. Barker noted that Claimant could count change, but otherwise had poor calculation skills, very poor reading and spelling skills, and appeared to have borderline intelligence. On intelligence testing, he had a verbal IQ score of 69, a performance IQ of 71, and a full scale IQ of 68. (*Id.*). These scores were considered valid, and based on the scores, Claimant functioned intellectually in the mildly mentally retarded to borderline range. His reading, spelling, and arithmetic scores on the Wide Range Achievement Test placed him below the third grade level

and were considered "non functional for most purposes." (Tr. at 576). Dr. Barker diagnosed Claimant with Major Depression and Borderline to Mild Mental Retardation. He opined that Claimant's "reported physical problems coupled with agitated depression and low intellectual functioning make it unlikely that he would be able to meet quality standards and production norms in a competitive employment situation." (Tr. at 577).

On December 1, 2010, Claimant was sent to Lisa C. Tate, M.A., for an updated evaluation at the request of the SSA. (Tr. at 579-584) Ms. Tate completed a clinical interview, mental status examination, Wechsler Adult intelligence Scale-Fourth Edition, and a neurobehavioral cognitive status examination. She observed that Claimant appeared at the evaluation wearing casual clothes and a soft back brace. He had a driver's license for identification, but had been driven to the appointment by his wife. His grooming and hygiene were good. He reported living with his wife and his wife's niece in Lincoln County, West Virginia. His current complaints were pain and depression. (Tr. at 579-80).

Regarding his education history, Claimant stated that he repeated the first grade and was placed in special education in the third grade. He attended school for nine to ten years and was not sure of the grade that he was in when he dropped out at age 16. He admitted that he could not read or write well enough to read his own mail or complete a job application, and he could not manage money. He relied on his wife to write all of the checks and handle the checkbook. Ms. Tate noted that she had read Dr. Barker's evaluation report and documented his IQ test results. (Tr. at 580).

Ms. Tate reviewed Claimant's medical, substance abuse, and mental health treatment history with him. (Tr. at 580-81). She recorded his medications and

complaints related to the motor vehicle accident in 2007. Claimant denied having any mental health treatment in the past or any recent illnesses or injuries. As far as his vocational background, Ms. Tate documented that Claimant's most recent job was working as a foreman in the oil and gas field for two or three year before he was injured in the motor vehicle accident. Prior to that job, he worked in construction, as a roofer, and helping his stepfather in the timber business. His job in the oil and gas business was the longest job he had held, although he had never been fired from a job. (Tr. at 581).

After a fairly unremarkable mental status examination, Ms. Tate administered the intelligence testing. Claimant scored a 68 on verbal comprehension, 79 on perceptual reasoning, 63 on working memory, 76 on processing speed, with a full scale IQ of 67. Ms. Tate found the scores to be valid, noting that Claimant understood and followed the directions, was relaxed and comfortable, maintained a consistent level of effort, was persistent and required little encouragement. (Tr. at 582). The results of the neurobehavioral cognitive status examination revealed Claimant to function generally in the average range with mild deficiencies in the categories of attention and calculations. (Tr. at 584). These results were also considered to be valid.

Based upon her examination and testing, Ms. Tate diagnosed Claimant with depressive disorder, NOS, and borderline intellectual functioning. (Tr. at 584). According to Ms. Tate, her diagnosis of borderline intellectual functioning was based on the valid test results and Claimant's estimated level of adaptive functioning. She stated: "Though his scores fell in the range of mild mental retardation, his adaptive functioning indicates a higher level of ability. Mr. Cook has a driver's license and

most recently reportedly worked as a foreman in the oil and gas field for a two- to three-year period." (*Id.*).

Ms. Tate additionally completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental) Form. (Tr. at 586-88). She found Claimant to have moderately deficient concentration, causing moderate limitations in his ability to understand, remember, and carry out complex instructions, and make judgments on complex work-related decisions. (Tr. at 586). Ms. Tate believed that Claimant's depression resulted in a mild limitation in his ability to interact appropriately with others and to respond appropriately to usual work situations and changes. (Tr. at 587). Finally, Ms. Tate opined that Claimant was not capable of managing his own benefits due to his self-reported shortcomings dealing with financial matters. (Tr. at 588).

## VI.   <u>Standard of Review</u>

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In Blalock v. Richardson, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). This Court is not charged with conducting a *de novo* review of the evidence. Instead, the Court's function is to scrutinize the record and determine whether it is adequate to support the conclusion of the Commissioner. *Hays*, 907 F.2d at 1456.

When conducting this review, the Court does not re-weigh evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 2001) (citing *Hays*, 907 F.2d at 1456)). Moreover, "[t]he fact that the record as a whole might support an inconsistent conclusion is immaterial, for the language of § 205(g) ... requires that the court uphold the [Commissioner's] decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'" *Blalock*, 483 F.2d at 775 (citations omitted). Thus, the relevant question for the Court is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig*, 76 F.3d at 589).

**VII.   Discussion**

A claimant should be found disabled at the third step of the sequential evaluation process when his or her impairments meet or medically equal an impairment included in the Listing. The Listing describes "for each of the major body systems, impairments which are considered severe enough to prevent a person from doing any gainful activity." *See* 20 C.F.R. § 416.925. Because the Listing is intended to identify those individuals whose mental or physical impairments are so severe that they would likely be found disabled regardless of their vocational background, the SSA intentionally set the criteria defining the listed impairments at a higher level of severity than that required to meet the statutory definition of disability. *Sullivan v. Zebley,* 493 U.S. 521, 532, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990). However, "[f]or a claimant to show that his impairment matches a [listed impairment], it must meet *all* of the specified medical criteria." *Id.* at 530. The

claimant bears the burden of production and proof at this step of the disability determination process. *Grant v. Schweiker,* 699 F.2d 189, 191 (4th Cir. 1983).

Section 12.00 of the Listing pertains to Mental Disorders, which are arranged in nine diagnostic categories, including listing 12.05 (Mental Retardation[1]). 20 C.F.R. Pt. 404, Subpt. P, App'x 1 § 12.00. According to the regulations:

> The structure of the listing for mental retardation (12.05) is different from that of the other mental disorders listings. Listing 12.05 contains an introductory paragraph with the diagnostic description for mental retardation. It also contains four sets of criteria (paragraphs A through D). If [a claimant's] impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, [the SSA] will find that [the] impairment meets the listing.

*Id.* Put simply, to qualify for disability under listing 12.05C, Claimant must establish that he has an intellectual impairment that satisfies both the *diagnostic description* of mental retardation and the *severity criteria* set forth in paragraph C. The diagnostic description of mental retardation, sometimes called the first prong of the listing, is "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period, i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. Part 404, Subpart P, App'x 1 § 12.05. The severity criteria of paragraph C, which constitute the next two prongs of the listing, include: "a valid verbal, performance, or full scale IQ of 60 through 70" **and** "a physical or other mental impairment imposing an additional and significant work-related limitation of function." *Id.*

In this case, the ALJ found that Claimant did not meet or equal the second prong of Listing 12.05C because he did not "have sufficient IQ scores to demonstrate

---

[1] The term "mental retardation" was replaced with "intellectual disability" effective September 3, 2013. 78 Fed.Reg. 46,499–46,501 (Aug. 1, 2013). However, this change "does not affect the actual medical definition of the disorder or available programs or service," *Id.* at 46,500. Moreover, the structure of the listing, its diagnostic description, and its severity criteria are unchanged.

such a mental impairment as is required of the Listing at Section 12.05C." (Tr. at 15). The ALJ extrapolated on this statement in a later passage of his written decision wherein he discussed Claimant's IQ scores in more detail. The ALJ acknowledged Claimant's full scale IQ of 68 obtained by Dr. Barker in 1993, and Claimant's full scale IQ of 67 obtained by Ms. Tate in 2010. However, the ALJ explained that despite these scores, he did not believe that Claimant was mildly mentally retarded. Instead, he adopted Ms. Tate's assessment that Claimant had borderline intellectual functioning because that diagnosis was "more consistent with Claimant's work history." (Tr. at 19).

Claimant argues that this finding by the ALJ was clearly erroneous for several reasons. First, Claimant supplied a valid full scale IQ score of 67 and a valid full scale IQ score of 68, both of which unequivocally fall within the 60-70 range required by the second prong of listing 12.05C. In addition, while Claimant's scores from the Lincoln County school system were not available, they placed Claimant in the category of "educable mentally retarded," providing further proof that Claimant met the IQ score criterion of listing 12.05C. Second, the ALJ made no effort to analyze the evidence surrounding the IQ scores before he rejected them. Finally, the ALJ failed to reconcile conflicts in the record. In Claimant's view, substantial evidence in the record undermined the validity of Ms. Tate's rationale for finding that Claimant's intellectual functioning was borderline despite his IQ scores, yet the ALJ never addressed the discrepancies in Ms. Tate's presumptions.

In regard to Claimant's first argument, the law is well-settled that while the results obtained by a licensed psychologist following administration of accepted intelligence tests are entitled to considerable weight in Social Security cases, the ALJ

is not required to accept such scores. *See Clark v. Apfel,* 141 F.3d 1253, 1255 (8th Cir. 1998); *see also Craig v. Chater,* 76 F.3d 585, 589 (4th Cir. 1996); *Coffman v. Bowen,* 829 F.2d 514, 517 (4th Cir. 1988); *Foster v. Heckler,* 780 F.2d 1125, 1130 (4th Cir. 1986). The ALJ may reject IQ scores if they are inconsistent with other substantial evidence in the record, such as conflicting professional opinions, or other evidence indicating that the claimant historically achieved higher scores or has more advanced functional capacities than would be expected from someone with a below-average IQ. *Clark*, 141 F.3d at 1255; *see also Hancock v. Astrue*, 667 F.3d 470, 474 (4th Cir. 2012) ("[A]n ALJ has the discretion to assess the validity of an IQ test result and is not required to accept it even if it is the only such result in the record."). Accordingly, the mere fact that the ALJ found that Claimant did not meet listing 12.05C even though he had IQ scores within the 60-70 range is not, by itself, error.

However, Claimant's second and third arguments are persuasive given that Claimant had a consistent history of valid IQ scores in the range associated with mental retardation. At age thirteen, the results of Claimant's intelligence testing placed him in the category of educable mentally retarded, resulting in an IEP. In 1993, at age 28, Claimant's full scale IQ score of 68, which was confirmed by the tester to be valid, again fell in the category of mildly mentally retarded. His most recent IQ score was 67. Once more this score was verified as valid and fell at the top range of mental retardation. In light of these IQ scores, the ALJ's statement at the third step of the sequential process that Claimant "does not have sufficient IQ scores to demonstrate such a mental impairment as is required of the Listing at Section 12.05C" is incongruous. Obviously, that statement is insufficient to explain why Claimant's impairments do not meet or equal listing 12.05C. Likewise, this single

statement provides no explanation for the ALJ's rejection of IQ scores that are confirmed as "valid" and fall within the severity range set forth in the second prong of 12.05C. Finally, this statement supplies no justification for neglecting to perform a thorough evaluation of the evidence pertaining to listing 12.05C.

Even later, when the ALJ implicitly clarified his statement by adopting Ms. Tate's diagnosis of borderline intellectual functioning and by referring to Claimant's work history, the ALJ failed to articulate an analysis sufficient to show that he had considered all of the relevant evidence. Because it is not clear to the undersigned that the ALJ conducted a proper review at the third step of the disability determination process, the case should be remanded for further proceedings. *Beckman v. Apfel,* No. WMN-99-3696, 2000 WL 1916316, at *9 (D.Md. Dec. 15, 2000) ("In cases where there is 'ample factual support in the record' for a particular listing, the ALJ must provide a full analysis to determine whether the claimant's impairment meets or equals the listing.") (quoting *Cook v. Heckler,* 783 F.2d 1168, 1172 (4th Cir.1986)).

Here, Claimant reportedly was found disabled in the past and was awarded SSI benefits on the basis of mild mental retardation and spondylolisthesis. (Tr. at 54-55, 163). Claimant allegedly received SSI benefits until his *physical condition* improved to the point where he could return to work. (*Id.*). Considering the prior finding by the SSA, the ALJ should have fully evaluated the relevant evidence and reconciled conflicts in the record before rejecting Claimant's IQ scores as underrepresenting his intellectual functioning. This is particularly true for two reasons. First, barring evidence of a change in intellectual functioning, an individual's intelligence remains relatively constant throughout his life; therefore, mental retardation is recognized as a "lifelong condition." *Luckey,* 890 F.2d at 668

(quoting *Branham v. Heckler,* 775 F.2d 1271, 1274 (4th Cir. 1985). Second, Claimant's case was remanded by the Appeals Council in large part to evaluate the status of his intellectual impairment. (Tr. at 92-93). Therefore, ample factual support existed in the record to trigger a thorough analysis by the ALJ.

On remand, the ALJ should fully examine whether Claimant meets the diagnostic definition of listing 12.05C. As previously stated, the ALJ adopted Ms. Tate's diagnosis of borderline intellectual functioning, stating that this diagnosis was "more consistent with claimant's work history." (Tr. at 19). Unfortunately, the ALJ did not elucidate further. Nevertheless, the ALJ alluded to the same point raised by the Appeals Council in its Order when it discussed evidence pertaining to Claimant's adaptive functioning. The Appeals Council noted Claimant's full scale IQ of 68 and his reported history of special education, but also emphasized the presence of evidence that Claimant lived independently, alleged only physical impairments, engaged in semi-skilled to skilled work in the past, and was approved by the State of West Virginia to care for foster children. (Tr. at 92-93). Clearly, the expectation of the Appeals Council was that the ALJ would fully review, consider, and weigh this evidence related to Claimant's adaptive functioning.

In the introduction to Section 12.00, the SSA explains that "[s]tandardized intelligence test results are essential to the adjudication of all cases of intellectual disability that are not covered under the provisions of 12.05A." 20 C.F.R. Part 404, Subpart P, App'x 1 § 12.00. However, "since the results of intelligence tests are only part of the overall assessment, the narrative report that accompanies the test results should comment on whether the IQ scores are considered valid and consistent with the developmental history and the degree of functional limitation." *Id.* Furthermore,

when "considering the validity of a test result, [the ALJ] should note and resolve any discrepancies between formal test results and the individual's customary behavior and daily activities." *Id.* Indeed, IQ test results must be examined "to assure consistency with daily activities and behavior." *Popp v. Heckler,* 779 F.2d 1497, 1499 (11th Cir. 1986).

Although the criterion involving IQ score is found at the second prong of listing 12.05C, the accuracy of the score in relation to the diagnosis of mental retardation is often determined by the claimant's level of adaptive functioning. The description of "mental retardation" set forth in listing 12.05C is "consistent with, if not identical to, the definitions of [mental retardation] used by the leading professional organizations," including the American Psychiatric Association. Technical Revisions to Medical Criteria for Determinations of Disability, 67 Fed. Reg. 20018–01, at 20022 (April 24, 2002). According to the American Psychiatric Association, "significantly subaverage general intellectual functioning is defined as an IQ of about 70 or below," with IQ levels of 50-55 to approximately 70 corresponding with "mild mental retardation." *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) at 41-42 (4th ed., text revision, American Psychiatric Association, 2000). In contrast, "borderline intellectual functioning" is associated with IQ levels in the 71 to 84 range. *Id.* at 740. The DSM-IV nonetheless cautions that "there is a measurement error of approximately 5 points in assessing IQ," and thus "it is possible to diagnose Mental Retardation in individuals with IQs between 70 and 75 who exhibit significant deficits in adaptive behavior. Conversely, Mental Retardation would not be diagnosed in an individual with an IQ lower than 70 if there are no significant deficits or impairments in adaptive functioning." *Id.* For this reason,

26

evidence relevant to the diagnostic definition, or the first prong of the listing, should generally be considered when deciding whether to reject an IQ score that falls with the second prong's requisite range of 60-70. Because the ultimate question is "whether the decision to disregard the scores as unreliable is supported by substantial evidence from the record as a whole," *Pogue v. Astrue,* 692 F. Supp.2d. 1088 (E.D.Mo. 2010), "the propriety of [the] ALJ's decision to discredit an IQ score hinges on the specific facts presented by the record." *Hutson v. Colvin,* No. 6:12-cv-00678, 2013 WL 5409837, at *5 (S.D.W.Va. Sept. 25 2013) (citing *Hancock,* 667 F.3d at 475).

While Claimant's work history was an appropriate factor to consider in evaluating the accuracy of his IQ score, the ALJ erred by limiting his review to just that one factor, and by failing to explain precisely what it was about Claimant's work history that the ALJ believed was consistent with borderline intellectual functioning. If, as Claimant surmises, the ALJ's relied on Ms. Tate's stated rationale that the diagnosis of borderline intellectual functioning was supported by Claimant's work history as a "foreman" in the oil and gas field, then the ALJ's finding is factually unreliable. (Tr. at 584). There simply is no evidence in the record that Claimant was ever a foreman in any occupation. According to the Work History Reports prepared by Claimant and his wife, Claimant's oil and gas jobs required him to check wells and tanks to make sure that they were working, and to change charts. (Tr. at 306-08). These jobs did not require Claimant to have technical knowledge or skills, supervise other workers, or hire or fire people. (*Id.*). According to Claimant, he was not "a lead worker." (*Id.*). Nowhere in the record, other than in Ms. Tate's notes, is Claimant identified as a foreman, or supervisor of any kind.

On the other hand, if, as the Commissioner points out in her brief, the ALJ meant that "[Claimant's] ability to work, and his extensive work history after 1993 ... belie his current argument that he should be found disabled based on his 1993 IQ scores," (ECF No. 11 at 9), there is still a problem with the ALJ's rationale, but it is legal rather than factual. Listing 12.05C presumes that most mildly mentally retarded individuals with IQ scores in the range of 60-70 are capable of working. *Mebane v. Colvin*, No. 2:13–CV–43–FL, 2014 WL 3510208, at *7 (E.D.N.C., July 15, 2014). However, the listing further recognizes that the addition of a mental or physical impairment imposing a significant work-related limitation of function on top of the mental retardation will often disable these individuals. "Therefore, the fact that [a mildly mentally retarded claimant] has a history of continuous employment in the past is irrelevant to whether he has subsequently become disabled due to the development of additional severe impairments." *Id.* (citing *Radford v. Astrue,* No. 5:08–CV–421–FL, 2009 WL 1675958, at *6 (E.D.N.C. June 10, 2009)). Thus, work history "can be of limited relevance" in the case of an individual with mental retardation "if it precedes the development of additional severe impairments." *Id.* at 6.

Nevertheless, work history is one factor to examine when looking for deficits in adaptive functioning that manifested in the developmental period. *Richardson v. Colvin,* No. 8:12–cv–3507–JDA, 2014 WL 793069, at *12 (D.S.C. Feb. 25, 2014) ("[W]ork history, while it cannot preclude benefits where the Listing 12.05C criteria are otherwise met, ... can be relevant in determining whether a claimant manifested deficits in adaptive functioning"). Not only is the type of work performed by Claimant important, but his work record in general should be examined. In the ALJ's first

decision, he noted that Claimant had "a sporadic work history at best." (Tr. at 85). The ALJ described Claimant's work history as including minimal work in 1995 and construction work in 2004-2008 through self-employment, but added that "there were many years that claimant did not work at all." (*Id.*). The skill level of Claimant's prior work may also play a role in the ALJ's decision and should be clarified. *See Weedon v. Astrue,* No. 11–2971–DCN–PJG, 2013 WL 1315311, at *7 (D.S.C. Jan. 31, 2013), *adopted by* 2013 WL 1315206 (D.S.C. Mar. 28, 2013) (Claimant's past ability to perform skilled or semi-skilled work is evidence that he lacks deficits in adaptive functioning). At the first administrative hearing, the vocational expert testified that Claimant's work as a well tender was classified as "medium semiskilled." (Tr. at 47). At the second hearing, the same expert testified that Claimant's well tender work was classified as "medium skilled," but was "light" as he actually performed it. (Tr. at 69-70). In neither case did the vocational expert clarify the skill level of the well tender job as Claimant actually performed it. If, in fact, Claimant merely checked gauges on wells, as he described in a few of the Function Reports contained in evidence, did not use technical information or complete reports, and the only tool he used was a wrench, it is possible that his job as actually performed may not have risen to the level of semi-skilled work.[2] To further confuse matters, even though the vocational

---

[2] "Semi-skilled work" is defined as:

> [W]ork which needs some skills but does not require doing the more complex work duties. Semi-skilled jobs may require alertness and close attention to watching machine processes; or inspecting, testing or otherwise looking for irregularities; or tending or guarding equipment, property, materials, or persons against loss, damage or injury; or other types of activities which are similarly less complex than skilled work, but more complex than unskilled work. A job may be classified as semi-skilled where coordination and dexterity are necessary, as when hands or feet must be moved quickly to do repetitive tasks.

20 C.F.R. § 416.968(b).

expert opined that Claimant performed the well tender position at the light exertional level, the ALJ inexplicably determined that Claimant could not perform his past relevant work because Claimant was limited to occupations at the light and sedentary exertional levels. These inconsistencies require clarification and correction on remand.

Apart from the Claimant's work history, other evidence in the record should be analyzed, discussed, and weighed by the ALJ. For example, Claimant's educational records are highly relevant to a determination of his level of intellectual functioning, not only his placement in special education and his performance in those classes, but his departure from school before completing the ninth grade and the success of any subsequent training programs. While poor grades and special educational courses alone do not establish the diagnosis of mental retardation, *Henry v. Colvin,* No. 3:13-cv-357, 2014 WL 856358, at *10 (E.D.Va. Mar. 4, 2014), difficulties in school can be a key indicator of early deficits in adaptive functioning. *Salmons v. Astrue,* 5:10-cv-195-RLV, 2012 WL 1884485, at *7 (W.D.N.C. May 23, 2012) ("[F]unctional academic skill is the primary measure of deficits in adaptive functioning before age 22."). Additional factors to consider include Claimant's current level of literacy, *Rivers v. Astrue,* No. 8:10–cv–314–RMG, 2011 WL 2581447, at *4 (D.S.C. June 28, 2011), his level of independence in performing activities of daily living, *Holtsclaw v. Astrue,* No. 1:10-cv-199, 2011 WL 6935499, at *5 (W.D.N.C. Dec. 30, 2011), his ability to manage finances, *Hancock,* 667 F.3d at 476, his social/interpersonal skills, his ability to care for others, *Caldwell v. Astrue,* No. 1:09-cv-233, 2011 WL 4945959, at *3 (W.D.N.C. Oct. 18, 2011), communication limitations, and any other evidence tending to show whether Claimant's level of adaptive functioning is truly more consistent with

borderline intelligence than mental retardation. *See Weedon v. Astrue,* Case No. 0:11–2971–DCN–PJG 2013 WL 1315311, at *5 (D.S.C. Jan. 31, 2013) (collecting cases).

Finally, the ALJ needs to reconcile conflicting evidence. For instance, the record indicates that Claimant obtained his driver's license through oral examination, rather than by written testing. (Tr. at 574). Claimant repeatedly maintains that he is a poor reader, speller, and writer. He claims that he is unable to read his own mail, or complete a job application; essentially, that he is functionally illiterate. He allegedly relies on his wife "to do everything" for him. (Tr. at 580). Claimant's Function Reports were obviously completed with his wife's assistance, or by his attorney, and at least one field examiner noted that Claimant required his wife's help to answer questions, because his memory was so poor. (Tr. at 237, 253, 272, 281, 301, 312). Dr. Barker initially commented that Claimant impressed him as functioning at borderline intelligence, but also commented that Claimant's psychological testing was borderline for "organic dysfunction." Ultimately, Dr. Barker diagnosed Claimant's intellectual functioning as "borderline to mild mental retardation," and he concluded that, due to Claimant's limited intellectual capacity, he could not successfully function in a competitive employment situation during periods when he was suffering from added physical and psychological impairments. (Tr. at 575-77). The ALJ was aware of Dr. Barker's opinion and the prior SSI award. Yet despite finding Claimant to have additional severe impairments of degenerative disc disease of the cervical and lumbar spines and depression, the ALJ never addressed and reconciled Dr. Barker's opinion with the conflicting determination of nondisability and the contradictory RFC opinion of Ms. Tate.

Not only did the ALJ effectively ignore Dr. Barker's opinion, which presumably formed the basis of the Commissioner's prior award of benefits, but he simultaneously skipped over subsequently collected evidence that arguably undermined the validity of Dr. Barker's conclusions. For instance, Claimant testified that his job as a well tender required him to drive great distances on a daily basis, apparently alone, across West Virginia, Kentucky and Ohio. (Tr. at 45). This testimony appears at odds with Claimant's allegations of illiteracy and of being entirely dependent upon his wife. At the administrative hearing, Claimant was able to answer the ALJ's questions without assistance. He had no apparent difficulty in understanding the inquiries and in remembering the information necessary to answer them. Claimant was able to describe his physical symptoms in detail, recall his medical conditions, and provide a general list of the type of medications he took daily. He also testified that prior to having medical problems, he regularly hunted, fished, and went camping. Claimant reported that he cared for his own children, as well as foster children, and he was the primary caretaker when his wife took GED classes. These daily activities demonstrate adaptive functioning arguably inconsistent with a diagnosis of mental retardation.

The ALJ had a duty to find the facts pertinent to listing 12.05C, analyze them, evaluate the credibility of the witnesses supplying the evidence, and determine the importance of conflicting evidence. *Hancock,* 667 F.3d at 476. He then had a duty to evaluate Claimant's impairments under listing 12.05C and provide a reasonable explanation for why the impairments did or did not meet or equal the requirements of the listing. A review of the written decision demonstrates that the ALJ failed to thoroughly consider the evidence pertaining to deficits in adaptive functioning, failed

32

to properly complete the 12.05C analysis, failed to weigh and reconcile conflicting evidence, and certainly failed to explain in any meaningful way how he concluded that Claimant did not "have sufficient IQ scores to demonstrate such a mental impairment as is required of the Listing at Section 12.05C," but rather had borderline intellectual functioning.

Therefore, for the foregoing reasons, the undersigned finds that the written decision does not reflect a clear and thorough analysis of the evidence at step three of the disability determination process; specifically, as to the issue of whether Claimant's impairments meet or equal listing 12.05C . For that reason, the undersigned **FINDS** that the ALJ's decision is not supported by substantial evidence.

## VIII.  <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **GRANT** Plaintiff's motion for a remand, (ECF No. 10); **DENY** Defendant's request to affirm the decision of the Commissioner, (ECF No. 11); **REVERSE** the final decision of the Commissioner; **REMAND** this matter pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings to determine if  Claimant's impairments meet or equal listing 12.05C; and **DISMISS** this action from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable Thomas E. Johnston, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil

33

Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Johnston and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED**: January 20, 2015

Cheryl A. Eifert
United States Magistrate Judge